FILED
05/22/2017
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 21, 2017

**STATE OF TENNESSEE v. MELVIN KING**

**Appeal from the Criminal Court for Knox County**
No. 104304   Steven Wayne Sword, Judge

_____

**No. E2016-01043-CCA-R3-CD**

_____

Defendant, Melvin King, was convicted by a Knox County jury of first degree murder, aggravated burglary, employing a firearm during the commission of a dangerous felony, three counts of especially aggravated kidnapping, reckless aggravated assault, attempted especially aggravated robbery, and aggravated animal cruelty. He was sentenced to an effective life sentence. On appeal, he argues that the evidence is insufficient to support dual convictions for especially aggravated kidnapping and attempted especially aggravated robbery, that the trial court improperly allowed the State to admit autopsy photographs into evidence, and that the trial court improperly gave the jury an instruction on flight. After a review of the record, we affirm the judgments of the trial court. However, because the trial court did not enter judgment forms disposing of each count of the indictment, we remand the matter to the trial court for entry of a separate judgment form for each count of the indictment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J. ROSS DYER, JJ., joined.

Phillip Lomonaco (at trial) and J. Liddell Kirk (on appeal), Knoxville, Tennessee, for the appellant, Melvin King.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

In October of 2014, Defendant and four codefendants—Braylen Bennett, Roderick Curtis, Dwaine Love, and Charles Byrd—were indicted by the Knox County Grand Jury in a multi-count indictment after an incident at the home of John Huddleston during which Mr. Huddleston was shot and killed. The indictment charged the defendants with twenty-five different offenses, including: three counts of aggravated burglary (in concert with two or more persons); one count of employing a firearm during the commission of an aggravated burglary; two counts of the especially aggravated kidnapping of Jeremiah Gilman; two counts of the especially aggravated kidnapping of John Huddleston; eight counts of the first degree felony murder of John Huddleston; one count of the aggravated assault of Sydney Smith (in concert with two or more persons); two counts of the attempted especially aggravated robbery of Daniel Nicely; two counts of the attempted especially aggravated robbery of Jeremiah Gilman; one count of aggravated animal cruelty by killing a companion animal; and one count of aggravated animal cruelty by seriously injuring a companion animal.[1]

Mr. Huddleston, the murder victim, lived at a house on Valley View Drive in Knoxville with several other people and two dogs. He rented bedrooms in the house to Daniel Nicely and Jeremiah Gilman. Mr. Nicely sold marijuana from the house and often kept cash and a quantity of marijuana in a small safe or in other locations around the house. Cody Hall also lived at the house. Sydney Smith, the girlfriend of Mr. Nicely, was at the house on the evening the incident took place.

Defendant came to the house two days before the incident and talked to Mr. Nicely. Mr. Nicely recalled that Defendant "asked [him] for a girl's name, if she lived there." He did not know Defendant and told him that the girl did not live at that address. After Defendant left, Mr. Nicely and the victim talked about how Defendant's actions were "a little strange and peculiar" so they walked out to the front porch and saw Defendant "hop into a gray Infinity" with a missing front license plate and drive away.

On June 25, 2014, Charles Byrd got a new job and wanted to get some marijuana to celebrate. Mr. Byrd, who testified at trial for the State, recalled that he had been hanging out with codefendants Dwaine Love and Braylen Bennett that day and that none of them were able to find any marijuana. At some point that day, Mr. Byrd, Mr. Love, Mr. Bennett, Defendant, Rodrick Curtis, Brandon Phelps, and someone identified only as "BJ" were all hanging out together. Defendant suggested to the group that he knew of a location where marijuana was available. The group discussed a plan to get marijuana

---

[1] Prior to trial, Mr. Bennett, Mr. Curtis, Mr. Love, and Mr. Byrd pled guilty. They pled guilty to the offenses as charged in the indictment, with the exception of first degree murder, for which they pled guilty to the lesser included offense of facilitation of first degree murder. Mr. Byrd and Mr. Curtis testified for the State at trial.

from the victim's house by robbing the people at the house. Defendant offered money to everyone who became involved in the proposed robbery. The victim was the specific target.

During the evening of June 25, 2014, the victim, Mr. Nicely, Mr. Hall, Ms. Smith, and Mr. Gilman were hanging out at the house watching television. At some point that night, Ms. Smith got a text message from a friend asking how many people were hanging out at the house that night. By the early morning hours of June 26, Mr. Nicely and Ms. Smith, were asleep in their bedroom while Mr. Hall was asleep on the couch. Mr. Gilman was not in his bedroom as he was awake in the living room watching television.

That night, the defendants went to the victim's house in two separate cars, a Jeep and Defendant's Toyota Camry. Mr. Byrd, Mr. Love, Mr. Curtis, and Defendant went to the front door while Mr. Bennett, Mr. Phelps, and "BJ" went to the back door. They all wore bandanas or fabric over their faces, and two of the men had guns. When someone came to the back door with a gun, Mr. Curtis, Mr. Phelps, and Mr. Bennett ran around the house and entered through the front door.

Mr. Hall was awakened by a "loud bang at the door." He jumped up from the couch in time to see Mr. Gilman "flying across the room." He saw "someone with a gun running in the house, and . . . people behind him just bum rushing in." Mr. Hall took a defensive position on the floor but was almost instantly thrown on the couch. Someone placed what he described as a "gray silver shade" colored gun to his head and demanded to know the location of the "dope." The men hit Mr. Hall "four or five times on the head" and then told him to keep his "head down." He sought refuge under a table. Mr. Hall saw Mr. Gilman "getting hit" by the men. At some point, Mr. Gilman was told to unplug the PlayStation. From his vantage point under a table, Mr. Hall could hear the men telling someone down the hall in one of the bedrooms to "open the door." They threatened to shoot through the door of one of the bedrooms.

Mr. Nicely was asleep in his bedroom and "woke to a bunch of yelling and loud noises and guys demanding stuff." Ms. Smith awoke to "three loud bangs" coming from "the front of the house." Mr. Nicely's bedroom door was open at the time he awoke. He saw someone run past his bedroom door so he jumped up out of bed and shut the door and locked it. He grabbed the .22 rifle he kept in his room and "was looking for [his] SKS." Mr. Nicely put his gun down and "braced [himself] at the door." A man with his face partially covered with cloth came to the bedroom door and busted it down. Mr. Nicely later identified the man as Defendant because he recognized his "eyes and nose" from his visit to the house a few days earlier. Ms. Smith was also able to identify Defendant. Defendant placed a gun to Mr. Nicely's forehead and demanded "dope." Defendant also pointed the gun at Ms. Smith and told her to "[g]ive [him] all [her] stuff." Ms. Smith was "freaking out." Mr. Nicely was "scared" and thought that this "[c]ould be

it." A "frenzy" in the other room distracted Defendant momentarily and suddenly four to five males ran past the bedroom door with the victim "chasing them with a gun." Mr. Nicely propped the door to his bedroom back into place while Defendant and the other men were distracted. He and Ms. Smith remained inside the bedroom braced against the door.

At the same time Mr. Nicely and Ms. Smith were in the bedroom, Mr. Hall was still hiding in the living room under a piece of furniture. He thought he first saw the victim "walking, and [the men] sat him down in the chair" in the living room. The men instructed Mr. Hall to continue to put his "head down." Mr. Hall then saw the victim go "to the hallway," and one of the dogs, Diesel, started "barking really loud." Mr. Hall grabbed the dog by the collar. The "next thing" he heard was the men yelling that the victim "ha[d] a gun." He heard multiple shots, and both he and Mr. Gilman immediately started "running towards the door trying to get out as fast" as possible. Mr. Hall, Mr. Nicely, and Ms. Smith all heard multiple shots but did not see who fired the shots or who was hit by the shots. Mr. Curtis saw both Defendant and Mr. Huddleston with a gun in the hallway immediately before the shooting started but never saw Mr. Huddleston fire the weapon.

Ms. Smith was sitting on the bed when the shots were fired and soon thereafter her leg started hurting. Ms. Smith realized that she had been shot. Suddenly "blood started running everywhere" so she "grabbed a sheet and wrapped it around [her] leg."

When the shooting stopped, Mr. Nicely opened the door and saw the victim "laying there," and it appeared he had been shot. When he realized the victim had been shot in the head, he "started to panic." Mr. Nicely yelled for help, and instead of assisting the victim, he grabbed a "small safe out of the table in the kitchen" and put it out in front next to the house before going back inside the house to check on the victim. The safe contained marijuana and cash.

Ms. Smith called 911 from the living room. She saw Mr. Nicely's dog, Diesel, lying on the ground with a gunshot wound. Diesel later died. The other dog, belonging to Mr. Huddleston, "got shot in the foot and in the hip."

Once Mr. Hall was safely outside the house, he tried to find somewhere to seek refuge. Mr. Hall was about to knock on a neighbor's door when he saw a "group of people just running down the street." He surmised that they were the perpetrators so he "ran back to the house" just in time to hear Ms. Smith "scream" as she realized that she was shot through the leg and the buttocks. Mr. Hall walked in to the house and saw the victim "laying there." The victim was bleeding and had vomit in his mouth. Mr. Hall immediately began helping the victim by rolling the victim onto his side, cleaning out his mouth, and securing a towel or something to put under his head. By that time, Mr.

- 4 -

Nicely heard sirens and ran outside to meet the paramedics and police. Mr. Nicely was instructed to stay outside but was eventually allowed to enter the house to "load [his] dog [Diesel] up, because [his] dog was paralyzed" from being shot by the perpetrators. When the police first arrived, Mr. Nicely denied selling drugs out of the house. He later admitted that he sold drugs from the house.

The victim died as the result of nine gunshot wounds and two graze wounds, caused by at least seven gun shots. Testimony from the medical examiner detailed all of the victim's injuries. From the autopsy, it appeared that six of the shots were fired from the victim's right to left and from his back to his front, the most fatal of which was a shot entering above the victim's right ear and exiting his left forehead. The victim also received injuries from gunshot entrance and exit wounds in the right upper back, left forearm, right hip, left neck, left arm, left thigh, left groin area, and penis. Police recovered nine spent .40 caliber Smith & Wesson shell casings and three .40 caliber bullet cores from the scene. A .40 caliber handgun was located near the side of the road a few houses down the street. There were six bullets in the magazine when the gun was discovered and they were all .40 caliber Smith & Wesson. All of the spent shell casings and bullet cores located at the scene were determined to have been fired through the handgun found nearby. Both Mr. Byrd and Mr. Curtis testified at trial that Defendant used a .40 caliber handgun during the incident.

As Mr. Hall suspected, the perpetrators fled the scene shortly after the shooting. Mr. Bennett and Mr. Love drove off in Mr. Bennett's Jeep while Defendant, Mr. Phelps, and Mr. Curtis fled in Defendant's Toyota Camry. BJ, described only as a man from Atlanta, left the scene and was never seen again. Mr. Byrd walked around looking for a ride until he eventually saw Mr. Bennett coming back toward the house about an hour later. Mr. Byrd hopped in the Jeep with Mr. Bennett, Mr. Curtis, and Defendant, who had returned to the scene to recover evidence they left behind. Shortly after they picked up Mr. Byrd, the Jeep was stopped by police and all four men were arrested. Mr. Curtis had a fresh wound from being grazed by a bullet.

Police located two backpacks and a shirt near the house. The Jeep, Camry, and a silver Infinity belonging to Mr. Love were impounded. Items found in the backpacks and the vehicles included Defendant's identification card and Defendant's DNA.

John Hurst, an inmate serving a sentence for car burglaries, talked to Defendant and several of the codefendants when they were brought to the jail in Knox County for processing.[2] Defendant informed Mr. Hurst that he was arrested for a "dope" robbery gone wrong during which he shot someone five times—twice in the head and three times

---

[2] A videotape from the intake room at jail where the conversation occurred was introduced at trial, and Mr. Hurst identified himself and someone he claimed was Defendant.

in the chest.  Defendant told Mr. Hurst that a dog and a woman were also shot during the incident.

Mr. Bennett, Mr. Byrd, Mr. Curtis, and Mr. Love all pled guilty prior to Defendant's trial and received effective sentences of forty years each.  Mr. Byrd and Mr. Curtis testified at trial for the State.  The police never located "BJ" or Mr. Phelps.

At the conclusion of the proof, the jury found Defendant guilty of multiple offenses.  The following chart sets forth the jury's verdict with respect to each count and the sentences imposed by the trial court:

| Count | Charge | Jury Verdict | Disposition |
|---|---|---|---|
| 1 | aggravated burglary (commit assault) | guilty | 12 years |
| 2 | aggravated burglary (intent to commit assault) | guilty, merged with Count 1 | |
| 3 | aggrvated burglary (intent to commit theft) | guilty, merged with Count 1 | |
| 4 | employing firearm during commission of dangerous felony | guilty | 6 years, consecutive to Count 1 |
| 5 | especially aggravated kidnapping (confining Mr. Gilman) | guilty | dismissed by trial court |
| 6 | especially aggravated kidnapping (removing Mr. Gilman) | not guilty | |
| 7 | especially aggravated kidnapping (confining Mr. Hall) | guilty | 25 years |
| 8 | especially aggravated kidnapping (removing Mr. Hall) | not guilty | |
| 9 | especially aggravated kidnapping (confining Mr. Huddleston) | guilty | 25 years, consecutive to Count 7 |
| 10 | especially aggravated kidnapping (removing Mr. Huddleston) | guilty, merged with Count 9 | |
| 11 | first degree murder (during burglary) | guilty | life |
| 12 | first degree murder (during attempted burglary) | guilty, merged with Count 11 | |
| 13 | first degree murder (during robbery) | guilty, merged with Count 11 | |
| 14 | first degree murder (during attempted robbery) | guilty, merged with Count 11 | |
| 15 | first degree murder (during theft) | guilty, merged with Count 11 | |
| 16 | first degree murder (during attempted theft) | guilty, merged with Count 11 | |
| 17 | first degree murder (during kidnapping) | guilty, merged with Count 11 | |
| 18 | first degree murder (during attempted kidnapping) | guilty, merged with Count 11 | |
| 19 | knowing aggravated assault of Ms. Smith | guilty, reckless aggravated assault | 4 years |
| 20 | attempted especially aggravated robbery of Mr. Nicely (by violence) | guilty | 12 years |
| 21 | attempted especially aggravated robbery of Mr. Nicely (by fear) | guilty, merged with Count 20 | |
| 22 | attempted especially aggravated robbery of Mr. Gilman (by violence) | guilty | 12 years |
| 23 | attempted especially aggravated robbery of Mr. Gilman (by fear) | guilty, merged with Count 22 | |
| 24 | aggravated animal cruelty (by killing) | guilty | 2 years |
| 25 | aggravated animal cruelty (by seriously injuring) | not guilty | |

In the technical record submitted to this Court on appeal, we note that there are no formal judgment forms for counts five, six, eight, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, or twenty-five.  On remand, the trial court should enter a judgment form disposing of each count of the indictment.  *See State v. Davidson*, 509 S.W.3d 156, 217 (Tenn. 2016).

Defendant's motion for new trial was denied by the trial court. On appeal, Defendant challenges the sufficiency of the evidence, the admission of autopsy photographs of the victim, and the trial court's decision to give a flight instruction to the jury.

*Analysis*

*Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence for his conviction for especially aggravated kidnapping of Mr. Huddleston in count nine and his conviction for the especially aggravated kidnapping of Mr. Hall in count seven. Specifically, Defendant insists that he was "charged with entering the victims' residence to commit a robbery" and that there was "no evidence presented of any criminal motive to confine or remove anyone beyond what was necessary to obtain the drugs and/or money the group allegedly sought." Along with that argument, Defendant takes time to point out that there was no successful robbery of Mr. Huddleston and no attempted robbery of Mr. Hall. Defendant also argues Mr. Gilman may not have been "a victim of an attempted robbery" because there was no testimony that he owned the home or any of the items in the home that the perpetrators sought to obtain. While somewhat disjointed, we interpret Defendant's argument as suggesting that the kidnappings were merely incidental to the attempted robberies, and therefore in violation of *State v. White*, 362 S.W.3d 559 (Tenn. 2012), the lone case he cites in his brief to support his position. Defendant also "requests review of the sufficiency of the evidence of all convictions, and particularly for the convictions of especially aggravated kidnapping of [Mr. Huddleston] and of Mr. Hall and of attempted especially aggravated robbery of Mr. Gilman" without any further argument or citation to authority. The State counters that there was ample evidence from which the jury could have found Defendant guilty of the kidnapping convictions and that Defendant waived any further challenge to the sufficiency of the evidence.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the

proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Defendant was convicted of especially aggravated kidnapping for confining Mr. Hall in count seven, especially aggravated kidnapping for confining Mr. Huddleston in count nine, attempted especially aggravated robbery of Mr. Nicely by violence in count twenty, and attempted especially aggravated robbery of Mr. Gilman by violence in count twenty-two.[3] Defendant specifically challenges the kidnapping conviction involving Mr. Hall and the attempted robbery conviction involving Mr. Nicely on the basis that the convictions violate due process. A person commits especially aggravated kidnapping "who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty," T.C.A. § 39-13-302, and who accomplishes such unlawful removal or confinement "with a deadly weapon" or where the victim suffers "serious bodily injury," T.C.A. § 39-13-305(a)(1), (4). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. W 39-13-401. "Especially aggravated robbery is robbery . . . accomplished with a deadly weapon" and "where the victim suffers serious bodily injury." T.C.A. § 39-13-403. A conviction for criminal attempt, as relevant here, requires proof that the defendant acted "with the intent to complete a course of action or cause a result that would constitute the offense [of especially aggravated robbery], under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3).

Defendant suggests that he could not be convicted of both a kidnapping offense and a robbery offense with the facts as presented to the jury. In *White*, the lone case cited by Defendant to support his position, the supreme court addressed due process considerations affecting convictions for kidnapping and an accompanying felony such as robbery, rape, or assault. *See generally* 362 S.W.3d 559. The *White* court held that the removal or confinement must be "to a greater degree than that necessary to commit" an accompanying offense, such as robbery, rape, or assault. *Id.* at 580. The *White* court

---

[3] Defendant was actually indicted for and convicted of both the especially aggravated kidnapping of Mr. Gilman and the attempted especially aggravated robbery of Mr. Gilman. The especially aggravated kidnapping conviction with respect to Mr. Gilman was dismissed by the trial court.

eliminated the need for a separate due process analysis on appellate review, and held that "[t]his inquiry . . . is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard." *Id.* at 562 (overruling *State v. Anthony*, 817 S.W.2d 299, 306 (Tenn. 1991)). The court determined that the proper inquiry for the jury is "whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." *Id.* at 578. The court set forth a specific jury instruction, later included in the Tennessee Pattern jury instructions. *Id.* at 580-81; 8 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 8.03(a). The absence of a *White* instruction, when warranted, results in constitutional error unless the error was harmless beyond a reasonable doubt. *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013).

A few years after *White*, the supreme court determined that a "kidnapping charge accompanied by an aggravated burglary charge, standing alone, does not warrant a *White* instruction." *State v. Alston*, 465 S.W.3d 555, 564 (Tenn. 2015). However, crimes like robbery, rape, and assault may warrant such an instruction when charged along with kidnapping. *Id.* After *Alston*, the supreme court addressed the issue of whether a *White* jury instruction must be given when a defendant is charged with the kidnapping and robbery of separate victims. *See State v. Teats*, 468 S.W.3d 495 (Tenn. 2015); *State v. Williams*, 468 S.W.3d 510 (Tenn. 2015). In *Teats*, the court determined that

> [a] *White* jury instruction is not required when a defendant is charged with the kidnapping and robbery of different victims. The jury instruction we articulated in *White* was intended to address the due process concerns that arise when a defendant is charged with kidnapping a victim and other crimes, such as robbery, rape, or assault, that involve some inherent confinement of that victim. *Cf. State v. Salamon*, 949 A.2d 1092, 1117 (Conn. 2008) ("Our legislature . . . intended to exclude from the scope of . . . kidnapping . . . those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim." (emphasis added)). Where a defendant is charged with kidnapping and an accompanying offense involving some confinement of the same victim, there are appropriate due process concerns that the defendant could be convicted of two crimes—e.g. robbery and kidnapping—when he has only committed one crime—robbery. But where, as in this case, the State charged the Defendant with robbing the restaurant manager and kidnapping four other employees, the Defendant does not stand the risk of being convicted of kidnapping a victim he confined only long enough to rob. Simply put, the due process concerns articulated in *White* are not present, as the kidnapping of one or more victims can never be "essentially incidental" to an offense perpetrated against a different victim or victims. *See White*, 362 S.W.3d at 580.

- 9 -

*Teats*, 468 S.W.3d at 503. "Simply put, where a defendant kidnaps one victim while robbing another, the due process concerns articulated in *White* are not present, as the *kidnapping of one or more victims can never be 'essentially incidental' to an offense perpetrated against different a different victim or victims.*" *Williams*, 468 S.W.3d at 516 (emphasis added).

Comparing *Teats* and *Williams* to the case herein, we determine that there are no due process concerns in this case. Defendant was charged with the aggravated robbery of Mr. Gilman and the attempted especially aggravated robbery of Mr. Nicely. The attendant kidnapping convictions, on the other hand, pertained to victims Mr. Huddleston and Mr. Hall. In other words, the victims of the kidnapping convictions are not the same as the victims of the robbery convictions. Therefore, the only question is whether the evidence is sufficient to support Defendant's convictions for especially aggravated kidnapping and attempted especially aggravated robbery. The proof at trial, in a light most favorable to the State, showed that Defendant and the codefendants entered the home of the victims, and held Mr. Huddleston and Mr. Hall at gunpoint in the front of the house during a portion of the ordeal. Both men were threatened with guns; Mr. Hall was forced to keep his head down and sought refuge from the perpetrators under a table. At some point, Mr. Huddleston retreated to his bedroom, only to be chased by Defendant and others before a gunfight broke out. Defendant and others also held Mr. Gilman at gunpoint, and made him unplug a PlayStation before they took the PlayStation from the house. Defendant went into Mr. Nicely's bedroom, placed a gun to his head, and demanded "dope." Defendant's actions were sufficient to support the convictions for especially aggravated kidnapping and attempted especially aggravated robbery. Moreover, even though the indicted offenses did not warrant the *White* instruction, the trial court in this case gave a *White* instruction to the jury and the jury is presumed to have followed the instructions of the trial court. *State v. Reid*, 164 S.W.3d 286, 346 (Tenn. 2005). Defendant is not entitled to relief on this issue.

With regard to Defendant's blanket request for this Court to "review the sufficiency of the evidence of all convictions," we find this issue is waived. Defendant fails to make any argument with respect to this issue, save his one brief request, and fails to cite any authority to support his claim that the evidence supporting the remaining convictions is insufficient. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate reference to the record will be treated as waived in this Court."). Defendant has waived this issue.

*Autopsy Photographs*

Next, Defendant challenges the introduction of autopsy photographs of the victim. Defendant argues that the cause of the victim's death was not in dispute at trial and,

therefore, the photographs were more prejudicial than probative. The State argues that Defendant has waived the issue for failure to provide an adequate record for review or, in the alternative, that the trial court properly admitted the photographs.

We disagree with the State's argument that Defendant waived this issue for failure to supply a complete record, finding the record adequate for our review of the issue on appeal. According to the technical record, Defendant filed a pretrial motion seeking to exclude the photographs taken at the autopsy. According to a minute entry, the motion was held in abeyance. The State asserts that there was a hearing held on the motion prior to trial, but we find no indication of such in the record. Actually, at the beginning of the trial, counsel for Defendant reminded the trial court of "those pending motions on the . . . photographs to determine whether they're necessary for this case." Prior to the testimony of the medical examiner, the trial court held a jury-out hearing to determine the admissibility of photographs that were taken during the autopsy.

During the hearing, Dr. Darinka Mileusnic-Polchan testified for the State. She performed the autopsy on the victim and explained that the photographs taken during the autopsy were an "integral part of the autopsy" and helpful "especially in a complex case like this where there are multiple gunshot wounds. . . especially to show the relationships and the trajectories as they are related to the cause and manner of death." At the conclusion of the hearing, the trial court determined that the photographs were not gruesome and were relevant to "actually assist the jury in understanding" the case. The trial court determined the photographs were not "unfairly prejudicial" and, therefore, were admissible.

To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g.*, *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm. Cmts).

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issue at trial and their probative value is not substantially outweighed by their prejudicial effect. *Id.* at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at

951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of an abuse of discretion. *Id.* at 949; *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993). In *Banks*, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider the following: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. 564 S.W.2d at 951. "Moreover, the admissibility of photographic evidence does not depend upon the defendant's offer to stipulate to the facts depicted therein." *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000).

The photographs utilized by the State herein were admitted during the testimony of Dr. Mileusnic-Polchan, who performed the autopsy on the victim. The photographs showed the victim's unclothed body lying on a metal table. Various gunshot wounds are visible in the photographs, several of which show close-ups of the entrance and exit wounds. While the nature of the photographs alone make them graphic, the autopsy photographs are not gruesome. The victim's wounds are clean without excess blood and no internal organs are visible. Several of the pictures show close-ups of the victim's genitalia and gunshot wounds from bullets that passed through the victim' penis. While certainly graphic, they accurately depict the victim's wounds and are relevant to see the number and type of gunshot wounds suffered by the victim prior to his death. We agree that there was no dispute in this case regarding the injuries that the victim suffered, the cause of death, or what was depicted in the autopsy photographs. However, the trial court deemed the photographs relevant to explain to the jury the way in which the victim was shot and to assist the jury in evaluating the evidence, especially given the fact that there was no clear testimony as to who fired the first shots. We agree with the trial court's assessment. The trial court did not abuse its discretion in determining the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. Defendant is not entitled to relief on this issue.

*Flight Instruction*

Lastly, Defendant argues that the trial court erred in instructing the jury on flight. Defendant's one paragraph argument on this issue cites no cases to support his claim. Defendant agrees that the evidence supported the fact that he left the scene of the crime but insists that there was "no attempt to flee from the police" or hide out after the incident. In fact, Defendant was arrested within a few hours of the victim's death. The State argues that the trial court properly charged the jury. In the alternative, the State contends that any error was harmless.

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *see State v. Leath*, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is considered "prejudicially erroneous" only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id*. Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

Flight or attempted flight may bear upon the defendant's intent, purpose, or consciousness of guilt and may connect the accused with the commission of the offense. *Rogers v. State*, 455 S.W.2d 182, 186 (Tenn. Crim. App. 1970); *see also State v. Braggs*, 604 S.W.2d 883, 886 (Tenn. Crim. App. 1980). When the jury is presented with evidence of flight, it may draw an inference of guilt after considering the circumstances of flight in the absence of an explanation of the "reasons or motive" for the flight. *Rogers*, 455 S.W.2d at 187 (quoting 22A C.J.S. Criminal Law § 625). Flight requires both a leaving of the scene and a subsequent act indicative of an intent to flee:

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

*Dorantes*, 331 S.W.3d at 388 n.16 (quoting *Rogers*, 455 S.W.2d at 187). There must, however, be sufficient evidence to support the flight instruction. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004) (appendix). This Court has determined that evidence of fleeing the scene of the crime supports a flight instruction. *See, e.g., State v. Eddie Lee Curtis*, No. 1163, 1990 WL 145421, at *7 (Tenn. Crim. App. Oct. 5, 1990) (determining flight instruction proper where the defendant was seen driving from the scene immediately after the shooting), *perm. app. denied*, (Tenn. Dec. 3, 1990); *State v. Beasley*, 699 S.W.2d 565, 569 (Tenn. Crim. App. 1985) (determining evidence the defendant was "observed fleeing the scene of the crime" supported flight instruction); *Hall v. State*, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979) (finding flight instruction proper where the defendant was "observed fleeing the scene of the crime"). In this case, the proof showed that Defendant and the codefendants fled from the victim's home after the shooting. The fact that they later returned to the area to try to pick up items they left

- 13 -

behind is irrelevant.  The trial court properly included a jury instruction on flight. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.  The matter is remanded to the trial court for entry of judgment forms in counts five, six, eight, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, and twenty-five.

_____

TIMOTHY L. EASTER, JUDGE